# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VICTOR F. NOVAK II, M.D., F.A.C.S,  )
              )
    Plaintiff,      )
              )
  v.          )  **3:07cv304**
              )  **Electronic Filing**
SOMERSET HOSPITAL, et. al.,    )
              )
    Defendants.    )

## OPINION

   Plaintiff Victor F. Novak, II, M.D., F.A.C.S., is a board-certified general surgeon who practiced at Somerset Hospital ("Somerset Hospital" or the "Hospital") from 1993 until November 2005 when his privileges were terminated. Following his loss of privileges, Plaintiff filed this civil action against the Hospital, Michael J. Farrell ("Farrell"), M. Javad Saadat, M.D. ("Saadat"), and Peter T. Go., M.D. ("Go"). Plaintiff's First Amended Complaint (ECF No. 49), the operative pleading in this case, asserts federal antitrust claims as well as state law claims for tortious interference with contractual relations and breach of contract.[1] Presently pending before the Court is Defendants' renewed motion for summary judgment (ECF No. 162). For the reasons that follow, Defendants' motion will be granted in part and denied in part. The motion will be granted as to Plaintiff's antitrust claims and Plaintiff's state law claims will be dismissed pursuant to 28 U.S.C. § 1367(c) for want of subject matter jurisdiction and without prejudice to plaintiff refiling those claims in state court as authorized by 42 Pa. C. S. § 5103(b).

---

[1] This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims pursuant to 28 U.S.C. §1331. The Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. §1367(a).

## I. **Factual and Procedural Background**[2]

A. <u>The Parties, Somerset Hospital, and Conemaugh Hospital</u>

Plaintiff is a general surgeon whose principal place of business in located in Somerset, Pennsylvania.  (ECF No. 177 ¶ 1.)  He joined Somerset Hospital's medical staff in 1993 after completing his medical training at Conemaugh Memorial Hospital (now Conemaugh Memorial Medical Center, hereinafter, "Conemaugh").  (Id. ¶2.)  He has practiced as an independent general surgeon in Somerset and Cambria Counties since that time, with an office in Somerset Borough.  (Docket No. 182, ¶ 110.)  In 1995, Plaintiff was certified by the American Board of Surgery as a general surgeon, and he maintains that certification.  (Id. ¶ 112.)

Defendant Farrell was, at all times relevant to this litigation, the CEO of Somerset Hospital.  (ECF No. 177 ¶4.)  Defendant Saadat is a gastroenterologist on the Hospital's medical staff and, at all relevant times, served as president of the Hospital's medical staff as well as chairman of its Medical Executive Committee ("MEC").  (Id. ¶¶ 5, 7.)  Saadat performed endoscopy services that Plaintiff also performed.  (Id. ¶ 9.)  Defendant Go is a general surgeon on the Hospital's medical staff and, at all relevant times, was a member of its MEC.  (Id. ¶¶ 6, 8.)  Go's surgical practice overlapped to some degree with Plaintiff's, although Plaintiff performed certain procedures that Go did not perform.  (Id. ¶10.)  Unlike Plaintiff, Go is not board certified in general surgery.  (ECF No. 182, ¶ 136.)

Somerset Hospital, located at 225 South Center Avenue in the Borough of Somerset, is a non-profit corporation and is designated as a "Sole Community Hospital" under Medicare regulations, 42 C.F.R. §412.92(a).  (ECF No. 163, ¶ 16; ECF No. 182, ¶ 120.)  In relevant part,

---

[2] The following facts are derived primarily from Plaintiff's responses to Defendants' Statement of Facts Not in Dispute, ECF No. 177, and are largely uncontested.  Where disputed, the facts are set forth in the light most favorable to Plaintiff.

the regulations designate a facility as a "Sole Community Hospital" if it is more than 35 miles from other like hospitals or if it is located in a rural area and, because of distance, posted speed limits, and predictable weather conditions, the travel time between the hospital and the nearest like hospital is at least 45 minutes. 42 C.F.R. §412.92(a)(3). The closest hospitals to Somerset Hospital are: Meyersdale Hospital, located in Meyersdale, Pennsylvania, which is approximately 31 minutes from Somerset; Windber Hospital, which is approximately 41 minutes from Somerset; and Conemaugh, which is between 39 and 45 minutes from Somerset. (ECF No. 177, ¶ 12; ECF No. 182, ¶122.)

Since 1998, Plaintiff has been a member of Conemaugh's active medical staff and has held full surgical privileges there. (ECF No. 177 ¶11.) During the seven years that he held privileges at both Somerset Hospital and Conemaugh, Plaintiff performed surgeries at both facilities based on convenience, patient preferences, and the relative capabilities of both hospitals. (Id. ¶ 13.) At some point prior to the termination of his privileges at Somerset Hospital, a moratorium was placed on bariatric surgeries due to concerns over Plaintiff's and another surgeon's pre-operative treatment of patients. (Id. ¶14.) When this occurred, Plaintiff moved his bariatric surgeries to Conemaugh. (Id.)

Conemaugh, located approximately 32.5 miles from Somerset Hospital (ECF No. 177, Pl's Resp. to ¶ 16), is a regional hospital which draws patients primarily from Cambria and Somerset, but also draws substantial numbers from Bedford and Blair Counties. (Id. ¶ 20.) In fact, Conemaugh promotes itself as servicing patients in an eleven county area through its network of community hospitals, physician offices, and specialty services. (Id. ¶ 21.) Conemaugh's network of hospitals includes Meyersdale, located in the southern part of Somerset

County. (Id. ¶23.)  According to Google Maps, Conemaugh and Meyersdale are 41.6 miles apart on U.S. Route 219, which passes through Somerset.  (Id. ¶24.)

In 2012, Conemaugh added another primary care physician office to its network by purchasing the practice of Ann Smith, M.D., a family practitioner who, at the time of the purchase, had been serving as president of Somerset Hospital's medical staff.  (ECF No. 177, ¶22; Farrell Suppl. Aff. ¶4, ECF No. 164.)  Former patients of Dr. Smith are now being served by physicians who are employed by Conemaugh.  (Farrell Suppl. Aff. ¶4.)  Conemaugh has also added a cardiology practice located in Somerset and has sought zoning approval for a diagnostic center to be located less than a mile from Somerset Hospital. (ECF No. 177, ¶ 22.)

Conemaugh is a much larger and more comprehensive facility than Somerset Hospital. (ECF No. 177, ¶¶ 15, 16.)  For example, Conemaugh has an open heart surgery program, while Somerset Hospital does not.  (ECF No. 177, ¶ 38.)  In 2006 and 2007, over 27,000 surgeries were performed at Conemaugh, while some 7,184 surgeries were performed at Somerset Hospital.  (Id. ¶ 17.)  During this same time period, 13,440 endoscopies were performed at Conemaugh, while 2,738 were performed at Somerset Hospital. (Id. ¶ 18.)  For the period 2006-2007, Conemaugh's net patient revenue was $305 million, compared to Somerset Hospital's net patient revenue of $61 million.  (Id. ¶19.)

Conemaugh runs advertisements in the Somerset newspaper on a nearly daily basis, including ads for Conemaugh Valley Surgeons, a group of ten general surgeons employed by Conemaugh.  (ECF No. 177, ¶¶ 25, 26.)  Conemaugh also advertises on billboards in and around Somerset and on the Johnstown television station serving the Somerset area.  (Id. ¶¶ 27, 29.)  In addition, Conemaugh is listed in the Somerset telephone directory along with numerous other hospitals offering general surgery services, such as Meyersdale, Windber, Western Maryland

Health System in Cumberland, Maryland, and the UPMC hospitals located in Pittsburgh. (Id. ¶ 28.)

According to patient flow data reported by hospitals to the Pennsylvania Health Care Cost Containment Council (the "Council"), 21.6% of patients in what the Council defined as Somerset Hospital's primary service area went to Conemaugh in 2005 for inpatient general surgery services. (ECF No. 177 ¶ 30.) This same data shows that 22.36% of patients living in what the Council defines as Somerset Hospital's primary service area went to "other" hospitals for inpatient surgery, including hospitals in Greensburg, Pittsburgh and Cumberland, Maryland. Thus, nearly 44% of patients in the defined area obtained inpatient general surgery services at hospitals other than Somerset Hospital. (Id. ¶ 31.)

Defendant Farrell defines the primary service area of Somerset Hospital to include the seventeen zip codes located within a 10 mile radius of the Hospital. (ECF No. 177 ¶ 32.) In this "17-zip-code-area" from which Somerset Hospital draws 90% of its patients, more than 32% of these patients are admitted to Conemaugh, Meyersdale, and Windber. (Id. ¶ 33.)

B. The August 2005 Surgeries

On July 1, 2005, the U.S. Food and Drug Administration announced the recall of certain implantable cardiac defibrillator ("ICD") devices manufactured by Guidant Corporation. (ECF No. 177, ¶ 41.) As a result of the recall, two patients requested that Plaintiff perform surgeries to replace the battery generators on the recalled ICDs with non-recalled ICD generators. (Id.) Regulations promulgated by the Pennsylvania Department of Health stated that implantation of ICD devices may only be performed at hospitals with an open heart surgery program. *See* 28 Pa. Code §138.18(b). (ECF No. 177, ¶ 40.) Because Somerset Hospital did not have an open heart

surgery program, it was not authorized at the time to implant or change ICD devices. (ECF No. 177, ¶ 38.)

Plaintiff had privileges to implant and change pacemakers at Somerset Hospital. (ECF No. 177, ¶39.) Although Plaintiff did not have privileges to implant or change ICD devices, he states that he believed he had privileges, as well as the competency, to replace the battery generators of ICD devices, which he characterizes as a simple procedure performed by general surgeons. (Id., Pl.'s Resp. to ¶ 39.)

On August 9 and 15, 2005, Plaintiff performed surgeries to replace the battery generators on the recalled ICDs for the two patients. In scheduling these surgeries, Plaintiff identified the August 9, 2005 procedure as a pacemaker generator change. (ECF No. 177, ¶ 44.) When the patient was in the surgical holding area, Hospital staff realized that Plaintiff intended to replace the battery generators on the recalled ICDs. (Id. ¶ 45.) Upon realizing Plaintiff's intent, Sandy Mamula, the Director of Ambulatory/Surgical Services, contacted Dr. Jonathan Kates, the Chairman of the Hospital's Credential Committee, who told her to go ahead with the surgery. (Id., ¶ 46.) Plaintiff was unaware of Dr. Kates' approval at the time that he performed the August 9, 2005 surgery. (Id., ¶ 47.)

C. The Hospital's Investigation and Due Process Proceedings

After these incidents came to Defendant Farrell's attention, he appointed a task force to gather the facts related to the two surgeries. (ECF No. 177, ¶ 48.) Initially, Farrell and three other administrators began to investigate the surgeries. This administrative team consisted of Farrell, Mamula, Craig Saylor (a hospital administrator), and Ron Park (the Hospital's CFO), none of whom were physicians or members of the Hospital's medical staff. (ECF No. 182, ¶¶

162-64.)  Plaintiff was not informed in writing of the administrative group's activities regarding the surgeries.  (Id. ¶ 165.)

The administrators were eventually joined by Defendant Saadat (then President of the Medical Staff), Dr. Armstrong (the Chief of Surgery), and Dr. Chaudhuri (Director of the Cardiology Lab) to form part of a collective task force (the "Task Force").  (ECF No 177, ¶ 48.) This Task Force gathered information about the surgical incidents and met with Plaintiff on August 31, 2005.  (Id. ¶ 49.)  Farrell subsequently sent a letter to Saadat, who was also then Chairman of the Medical Executive Committee (the "MEC" or "Committee").

In this correspondence dated September 6, 2005, Farrell remarked that the "fact finding phase of this issue is complete" and the Task Force was "forwarding the matter to the Medical Executive Committee for their review of the matter." (Pl.'s Ex. F, ECF No. 175-6.)  The correspondence further stated:

> In research of the Medical Staff Bylaws and on advice of legal counsel, I would offer the following as an appropriate process.  The MEC should turn this matter over to the Chairman of the Department of Surgery.  Dr. Armstrong should then contact Dr. Novak and ask if Dr. Novak has any additional information he wants to provide to Dr. Armstrong, over and above what was presented to the Task Force.  Dr. Armstrong may also want to review the two medical records, interview Sandy Mamula or other operating room personnel and may want to also interview the Guidant and St. Jude representatives.
>
> Dr. Armstrong, when satisfied he has a full understanding of the matter, would return the matter to the MEC.  Dr. Armstrong needs to assure the MEC he has a complete understanding of the matter and information available to him.
>
> Dr. Armstrong should advise the MEC if he believes there is any deviation from the expected standard of care provided to the two patients.  If Dr. Armstrong believes there is a deviation from the expected standard of care, he should make known to the MEC the severity of the matter.
>
> The MEC would be responsible to determine if corrective action is necessary and warranted.  I would refer you to section 7.1.4 of the Medical Staff Bylaws that describes the MEC corrective action alternatives.  I would add there are specific timelines provided in section 7.1 of the Medical Staff Bylaws.

(Id.) Copies of the letter were sent to the other members of the Task Force, including Dr. Armstrong. (Id.)[3]

The MEC subsequently held meetings on September 14 and 21, October, 12, and November 2, 2005. (ECF No. 177, ¶ 51.) The minutes of the MEC's September 14 meeting reflect that Dr. Armstrong had been asked to review the pertinent patients' medical records prior to the meeting. (Pl.'s Ex. H, ECF No. 175-8.) Dr. Armstrong reported to the MEC at its September 14, 2005 meeting that, in his opinion, Plaintiff failed to meet the standard of care, exercised poor judgment and poor reporting and should at least receive a written reprimand. (ECF No. 177, ¶ 52.)[4]

At the MEC's September 21, 2005 meeting, Saadat and Go expressed their opinions that Plaintiff had exercised poor judgment. (ECF No. 177, ¶54.) Every other member of the MEC in attendance shared this view as well. (Id. ¶ 55.) During the meeting, the MEC discussed several other prior incidents involving Plaintiff, including its need to place a moratorium on Plaintiff's and another surgeon's performance of vertical banded gastroplasty procedures, Plaintiff's history of sexual misconduct with one of his patients, reviews of Plaintiff's performance of vascular surgeries, and Plaintiff's refusal to perform surgery on a patient who did not have insurance coverage. The Committee agreed that these past incidents should be included in the decision making process. (Id. ¶ 56.)

---

[3] A similar letter was sent to the same parties on September 7, 2005, repeating much of the same information. As Plaintiff observes, however, the September 7 letter acknowledges that: "much of this information" that Dr. Armstrong would be obtaining from Mamula, operating room personnel, pharmaceutical representatives, and Plaintiff "may be repetitive (e.g. the re-interviews) in the sense that the information from the interviews was elicited at the Task Force. However, the medical staff bylaws require this process." (Pl.'s Ex. G, ECF No. 175-7.)

[4] As Plaintiff observes, Dr. Armstrong is a board certified otolaryngologist. (*See* 177, ¶ 52.)

At its October 12, 2005 meeting, the MEC met with Edward Weisgerber, Esq., one of the Hospital's attorneys. (ECF No. 177, ¶ 57.) During this meeting, Dr. Armstrong expressed the Committee's unanimous view that the two ICD-related surgeries were the result of poor medical judgment. After consulting with Weisgerber, the MEC invited Plaintiff to present his side of the story. (Id.)

Plaintiff and his attorney met with the MEC on November 2, 2005. (ECF No. 177, ¶ 58.) Prior to the meeting, the MEC provided to Plaintiff a series of written questions for him to address. (Id. ¶59.)

After receiving Plaintiff's input, the MEC issued a confidential memorandum on November 7, 2005, to the Hospital's Board of Directors. (ECF No. 177, ¶60.) The MEC found that, while the incident concerning the ICD surgeries would not, in and of itself warrant revocation of Plaintiff's staff privileges, the calculus changed when the incident was considered in light of Plaintiff's historical pattern of operating without an awareness or appreciation of the potential consequences of his actions. (Pl.'s Ex. D, ECF No. 175-4.) The MEC emphasized that the incidents involving the ICDs were serious matters, that these episodes were consistent with prior incidents in which Plaintiff had exercised poor judgment, and that no other physician currently on staff had required as much time and attention from the medical staff as Plaintiff. (ECF No. 177, ¶ 61; Pl.'s Ex. D, ECF No.175-4.) The MEC expressed particular concern about Plaintiff because he continued to deny problems with judgment, which suggested to the MEC that there would likely be other incidents of misjudgment in the future. (Id.) The Committee also expressed concerns over its inability to formulate remedial measures that would assure that misjudgments of the sort experienced thus far would be caught early on and corrected. (Id.) The MEC indicated that it considered imposing a proctoring requirement but did not do so because,

in its view, a proctoring arrangement was impractical and not well-suited to address the underlying concern. (Pl.'s Ex. D at p. 6, ECF No. 175-4.) Rather than provide the Board with a specific sanction such as suspension or revocation, the MEC deferred the ultimate remedy to the Board, stating that the Board was better positioned to apply a more global policy judgment by evaluating the incident in light of Plaintiff's past performances, his pattern of misjudgments, and the Board's willingness to devote further resources to the resolution of matters that were likely to reoccur in one fashion or another. (Pl.'s Ex. D at p. 6-7, ECF No. 175-4.) Defendant Go abstained from voting at the MEC's meeting. (Pl.'s Ex. D at 8.)

The Hospital's Board met on November 14 and 21, 2005 to consider the MEC's findings. (ECF No. 177, ¶65.) Go did not attend any Board meetings. (Id. ¶ 67.) Saadat attended the November 14 meeting, along with Weisgerber and Daniel Rullo, Esq., who is serving as one of Defendants' attorneys in this litigation. (Id. ¶66.) Also present at the November 14 meeting was Leonard Ganz, M.D., a cardiologist, who participated by audio conference. (Id.) Dr. Armstrong, who was a member of the Board, presented the MEC Report to the Board. (Id. ¶ 68.) At this meeting, eight members of the medical staff asked to be heard; they were not permitted to speak but were advised that they would have an opportunity to present their concerns when the Board reconvened on November 21, 2005. (Id. ¶ 69.)

At the November 21 meeting, the Board heard from several physicians who presented concerns on behalf of Plaintiff. (ECF No. 177, ¶ 70.) Following more than four hours of discussion, the Board adopted a "Resolution" revoking Plaintiff's clinical privileges and staff appointment and invoking a summary suspension of Plaintiff's clinical privileges in the event Plaintiff appealed the Board's decision. (Farrell Dep. Ex. 12, ECF No. 82-4; Pl.'s Ex. BBB, ECF No. 175-53.)

The Resolution indicated that:

> The Board is taking these actions because it believes that it is in the best interest of patient care to do so. The Board has received and discussed the report of the Medical Staff Executive Committee (MEC) describing the committee's concerns relating to the replacement of ICD generators in two patients. It has also received the input of a well known and respected electrophysiologist (who is not on the staff of the Hospital). The MEC has concluded that Dr. Novak demonstrated poor judgment and performed at a level that is beneath the acceptable standard of care in each of these cases by (i) performing a procedure for which he is not credentialed, (ii) not consulting a cardiologist, and/or (iii) not testing the devices post-insertion or actively arranging for follow up testing by a qualified cardiologist. Moreover, the Board is concerned that the documentation of these events is, at best, sloppily inaccurate and at worst, deliberately inaccurate (in an effort to disguise the nature of the procedure).

> The Board has also reflected upon an underlying theme in the MEC's report which is that Dr. Novak has demonstrated a pattern of poor judgment in behavior and medical judgment, particularly as it relates to understanding the limits of a general surgeon in a non-urban community hospital. This observation is matched by the Hospital's prior experiences with Dr. Novak relating to gastric banding, peripheral vascular therapies, use of urokinese, refusal to take call for unreferred patients, the discharge of a patient for economic reasons, the insertion of a pacemaker against the recommendation of a board certified cardiologist, and an improper patient relationship episode. The Board is particularly troubled that to this day Dr. Novak appears not to recognize that he did anything wrong in connection with any of these serious incidents. The apparent sincerity of Dr. Novak's belief that his medical judgment is sound makes the Board more, not less, concerned that he will continue to stray beyond the proper bounds of his privileges and his competencies.

> The Board has considered other remedial measures, such as proctoring, pre-surgical review, and limiting his privileges to a list of specifically identified procedures. It is the Board's conclusion that these mechanisms are impractical. Moreover, armed with the sense of Dr. Novak's tendencies and pattern of judgment, the Hospital is unwilling to accept a liability risk attributable to either the inadvertent failure or the circumvention of these remedial measures. Nor is the Board inclined at this time to commit its financial and human resources to implementing and enforcing a monitoring protocol.

> Finally, the Board believes that the recruitment of general surgeons is impaired by the presence of a physician who is under special surveillance and who has proven to be a difficult colleague (e.g. refusing to cover, refusing to assume required call coverages).

(ECF No. 82-4 at 12-13.) The Resolution acknowledged that the Board's decision to revoke Plaintiff's privileges constituted an "adverse recommendation" under the Bylaws, triggering Plaintiff's rights under the Fair Hearing Plan, and it directed management to provide Plaintiff

written notification of its determination on November 22, 2005. (Id. at 13.) Farrell notified Plaintiff by letter dated November 23, 2005. (ECF No. 177, ¶ 73.)

Pursuant to §7.2.2 of the Bylaws, the MEC was required to review Plaintiff's summary suspension of privileges within seven days. While the MEC was not empowered to overturn the Board's decision, it was authorized under the Bylaws to "recommend modification, continuation or termination of the terms of the summary suspension." (Bylaws, Art. 7.2.2; ECF No. 177, ¶ 74.)

The MEC met on November 30, 2005 to review the Board's summary suspension of privileges. (ECF No. 177, ¶ 75.) At this meeting, the MEC voted 6 to 4 <u>not</u> to support the Board's resolution, with Go again abstaining from any vote. (Id. ¶¶ 75-76.)

On December 16, 2005, Plaintiff invoked his right to a hearing relative to the Board's action. (ECF No. 177, ¶ 77.) In response, the Hospital issued a letter to Plaintiff explaining the reasons for its adverse action. (Id.)

Pursuant to §4.3.2 of the Hospital's Fair Hearing Plan, a panel consisting of two medical staff members and three non-medical members of the Board was appointed to hear Plaintiff's appeal. (Id. ¶ 78.) The panel was comprised of Dr. Barbara Campbell and Dr. William Thompson, as well as Board members Brad Cober (a Somerset County Commissoner), Robert Bastian (a state representative), and Michelle Moon (a private accountant). (Id. ¶ 79.) Neither Saadat nor Go served on the hearing panel, nor were any of the members of the hearing panel actively involved in the initiation or investigation of the adverse action. (Id. ¶¶ 80-81.) Attorney Rullo was appointed to serve as the presiding officer and legal advisor to the hearing panel in a non-voting capacity. (Id. ¶83.) Rullo was also serving at that time as legal counsel to the Board and to the Hospital. (Id. ¶ 84.) Although Plaintiff objected to Rullo serving as presiding officer

and legal advisor to the hearing panel, he did not object to the composition of the panel relative to the five decision-making members. (Id. ¶ 81.) Between January 11, 2006 and April 29, 2006, the hearing panel conducted ten days of hearings, resulting in 1,897 pages of testimony and over one hundred exhibits. (ECF No. 177, ¶85.)

On March 23, 2006, Saadat wrote a letter to the Hospital's medical staff apprising them of Plaintiff's situation and stating that, "[a]s President of the Medical Staff and a nonvoting member of the Board of Directors, I voiced my concern and did not agree with the suspension of Dr. Novak's privileges." (Id. ¶ 86.) Saadat sent copies of this letter to Farrell and to Bruce Shipley, Chairman of the Hospital's Board of Directors. (Id. ¶ 87.) During the course of the fair hearing proceedings, Plaintiff's counsel entered the letter into evidence and later referred to it in his closing argument, stating:

> [A]s you know, Dr. Sadat [sic] is the president of the medical staff. Dr. Sadat [sic] first states, among some other things, that as president of the medical staff and a non voting participant of the board of directors, I voiced my concern and did not agree with the suspension of Dr. Novak's privileges.
>
> Then he goes on to say, continuing to be concerned over the divisive position of the medical staff, I encourage the board of directors and the hospital administration to continue dialogue with Dr. Novak to seek a fair resolution to this issue.
>
> Is that to be ignored? The president of the medical staff?

(ECF No. 177, ¶¶ 88-89.)

On May 22, 2006, the hearing panel issued a report of its findings and recommendations. (ECF No. 177, ¶ 90.) According to Article 5.7 of the Hospital's Fair Hearing Plan, the practitioner requesting the hearing has the burden to prove, by clear and convincing evidence, that the adverse recommendation or action lacks any factual basis or that the conclusions drawn therefrom are arbitrary, unreasonable or capricious. (ECF No. 177, ¶ 95.) Four of the five

members of the hearing panel concluded that Plaintiff failed to satisfy his burden in this regard. (Id. ¶ 96.) By a 4 to 1 majority, the panel concluded that there was no credible evidence of an effort to treat Plaintiff differently than any other physician on the Hospital's medical staff. (Id. ¶ 91.) This same 4-member majority also concluded that the process for evaluation of the ICD procedures was appropriate under the circumstances. (Id. ¶ 92.) Further, the panel unanimously concluded that the Board was justified in reviewing Plaintiff's past history in determining whether it demonstrated a pattern of poor judgment and whether the sanction of dismissal was appropriate. (Id. ¶ 93.)

Nevertheless, the panel also recommended, unanimously, that the suspension and revocation of Plaintiff's privileges be reconsidered and instead:

(1) That Dr. Novak submit[ ] a request for delineation of medical privileges to the Credentials Committee of Somerset Community Hospital limited to only those procedures that are generally accepted as within the confines of those performed by a general surgeon with the exception of the inclusion of pacemaker privileges. These privileges must be approved by the Credentials Committee, the MEC, and the Board.

(2) That for a period of five years or earlier if 3,000 separate proctored procedures have been performed, Dr. Novak must obtain by his efforts, a physician or physicians acceptable to the Hospital to conduct a pre-surgical consult before any procedure can be scheduled at Somerset Hospital. The physician performing the proctoring and/or consult shall document the following opinions before the non-emergency procedure can be scheduled:

(a) That Dr. Novak is credentialed to perform the procedure requested.

(b) That even if Dr. Novak has the credentials to perform the procedure, that he has demonstrated that he has performed sufficient number of the procedures to be adequately trained and capable of safety performing the procedure.

(c) That the procedure requested to be performed is reasonable under the circumstances and medically necessary.

(d) That the procedure requested to be performed is capable of being successfully performed at Somerset Hospital.

(3) The Hearing Panel further recommends that Dr. Novak be granted no leadership positions at the Hospital for a period of five years and that he apply for and

> successfully complete within six (6) months from the date of this Report a continuing
> medical education course designed for proper documentation of medical records and
> recommends that he obtain at his expense a software program designed to assist in
> the electronic documentation of patient records.

(ECF No. 82-6 at pp. 15-16.)

Pursuant to the Fair Hearing Plan, the Board was required to meet within thirty days to consider the hearing panel's report. (ECF No. 177, ¶ 98.)  Specifically, Article 6.2 provides that "[w]ithin 30 days after receipt of the report of the hearing committee, the Board shall consider the same and affirm, modify or reverse the recommendation or action in the matter.  It shall transmit the result together with the hearing record, the report of the hearing committee and all other documentation considered, to the Chief Executive Officer."  (ECF No. 177, ¶ 99.)

On May 31, 2006, the Board convened a special meeting.  After lengthy discussions, it voted 13 to 3 to affirm its decision to revoke Plaintiff's privileges.  (ECF No. 177, ¶ 100.)

Thereafter, Plaintiff invoked his right to appellate review in accordance with Article 7 of the Fair Hearing Plan.  (Id. ¶ 101.)  On July 10, 2006, the Board met and, after reviewing the parties' written submissions, voted 11 to 3 to uphold its decision, with one abstention.  (Id.)  By letter dated July 11, 2006, the Board notified Plaintiff of its decision to affirm the termination of his privileges.  (Id. ¶ 102.)

D.  Post-Termination Events

Following the termination of Plaintiff's privileges, Somerset Hospital functioned with one general surgeon (i.e., Defendant Go) from November 2005 to July 2006, when it added another general surgeon, Dr. Pradhan, to its staff.  (ECF No. 177 ¶ 104.)

Meanwhile, Plaintiff continued to practice surgery at Conemaugh. He continues to maintain an office at 223 South Pleasant Avenue in Somerset, in close proximity to Somerset

Hospital.  (ECF No. 177, ¶¶ 1, 36.)  In 2006, Plaintiff performed 417 surgical procedures at

Conemaugh.  (ECF No. 177 ¶ 34.)  In 2007 and 2008, he performed 352 and 475 surgeries,

respectively.  (Id.)  The vast majority of Plaintiff's patients come from Somerset and Cambria

Counties.  (Id. ¶ 35.)  In his surgical practice, Plaintiff is able to offer all of the services provided

at Somerset Hospital, plus additional services that Somerset Hospital does not offer.  (Id. ¶ 37.)

In November 2010, Plaintiff became president of the Somerset County Medical Society, a

position he presently holds.  (Id. 107.)

    E.  <u>The Present Litigation</u>

       Plaintiff commenced the instant litigation on November 20, 2007.  The operative

pleading in this case is the First Amended Complaint ("FAC," ECF No. 49), which was filed on

October 21, 2008.

       The FAC asserts five claims.  Counts I and II assert violations of the Sherman Act, 15

U.S.C. §§1 and 2 respectively, on the part of all the Defendants.  Count III asserts a claim against

the Hospital for injunctive relief, including (among other things) the reinstatement of his staff

and clinical privileges at the Hospital, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26.

Count IV asserts a claim under Pennsylvania law against all Defendants for tortious interference

with Plaintiff's prospective contractual relations with patients in and around Somerset.  Count V

asserts a claim against the Hospital under Pennsylvania law for breach of contractual obligations

under the Hospital's bylaws.

       Defendants originally filed their motion for summary judgment (ECF No. 81) and

supporting papers (ECF Nos. 80, 82) in September 2009.  Following extensive pretrial

proceedings, they filed their now-pending, renewed motion for summary judgment (ECF No.

162) and supporting documentation (ECF Nos. 161, 163, 164) on January 18, 2013.  Plaintiff

filed his oppositional papers (ECF No. 174, 175, 176) on April 26, 2013.[5]  On July 19, 2013,

Defendants filed their reply brief (ECF No. 181) and response to Plaintiff's counterstatement of

facts (ECF No. 182).  Plaintiff filed his sur-reply brief (ECF No. 185) on August 12, 2013.

Accordingly, the relevant issues have been adequately joined and are now ripe for disposition.

## II. Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); *Melrose, Inc. v. Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010).  Issues of fact are genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413

F.3d 359, 363 (3d Cir. 2005).  Material facts are those that will affect the outcome of the trial

under governing law.  *Anderson,* 477 U.S. at 248.  The Court's role is "not to weight the

evidence or to determine the truth of the matter, but only to determine whether the evidence of

record is such that a reasonable jury could return a verdict for the nonmoving party."  *American*

*Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009).  "In making this

determination, 'a court must view the facts in the light most favorable to the nonmoving party

and draw all inferences in that party's favor."  *Farrell v. Planters Lifesavers co.,* 206 F.3d 271,

278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and

identifying those portions of the record that demonstrate the absence of a genuine issue of

---

[5] Plaintiff filed his Amended Counter Statement of Facts (ECF No. 177) on May 24, 2013.

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.,* 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir. 1993).

### III. Discussion

Defendants move for summary judgment on several grounds. First, they contend they are immune from liability for money damages under the Health Care Quality Improvement Act, 42 U.S.C. §§11101 *et seq.* Second, they argue that Plaintiff cannot enforce his antitrust claims because he lacks antitrust standing. Third, they contend that the evidence fails to establish a violation of Section 1 of the Sherman Act for purposes of Count I of the First Amended Complaint. Fourth, they claim that Plaintiff has failed to demonstrate a violation of Section 2 of the Sherman Act for purposes of Count II. Fifth, Defendants argue that Plaintiff is not entitled to injunctive relief as prayed for in Count III. Sixth, Defendants assert that the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. Finally, Defendants argue in the alternative that Plaintiff's state law claims for intentional interference with contractual relations and breach of contract fail as a matter of law. The Court will begin its analysis with a discussion of Plaintiff's federal claims.

A.  Plaintiff's Federal Claims

Plaintiff's first three causes of action are premised on violations of the federal antitrust

laws.   Counts I and II respectively assert violations of Section 1 and 2 of the Sherman Act, 15

U.S.C. §§1 and 2.   Count III asserts a claim for injunctive relief in the form of reinstatement of

his staff membership and clinical privileges at the Hospital pursuant to §16 of the Clayton Act,

15 U.S.C. §26, premised upon the violations he is asserting in Counts I and II.   Defendants move

for summary judgment on all three counts.

1.  *Antitrust Standing*

"For plaintiffs suing under federal antitrust laws,[ ] one of the prudential limitations is the

requirement of 'antitrust standing.'"  *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d

223, 232 (3d Cir. 2013) (citing *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264

(1998))(internal footnote omitted).   A lack of antitrust standing does not deprive the court of

subject matter jurisdiction as an Article III standing deficiency does; however, a lack of antitrust

standing prevents the plaintiff from recovering under the antitrust laws.  *Id.* (citation omitted).   In

this circuit, courts consider the following factors in determining whether a complainant has

antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the
> plaintiff and the intent by the defendant to cause that harm, with neither factor
> alone conferring standing; (2) whether the plaintiff's alleged injury is of the type
> for which the antitrust laws were intended to provide redress; (3) the directness of
> the injury, which addresses the concerns that liberal application of standing
> principles might produce speculative claims; (4) the existence of more direct
> victims of the alleged antitrust violations; and (5) the potential for duplicative
> recovery or complex apportionment of damages.

*Ethypharm S.A. France*, 707 F.3d at 232-33 (*quoting In re Lower Lake Erie Iron Ore Antitrust*

*Litig.*, 998 F.2d 1144, 1165–66 (3d Cir.1993)). "The second factor, antitrust injury, 'is a

necessary but insufficient condition of antitrust standing.'" *Id.* at 233 (*quoting Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir.1997). If antitrust injury is lacking, courts need not address the remaining factors. *Id.*

Antitrust injury is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *Ethypharm S.A. France*, 707 F.3d at 233 (*quoting Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). Because the antitrust laws were "enacted for the protection of competition, not competitors," *Brunswick Corp.,* 429 U.S. at 488 (citation omitted), an antitrust plaintiff must show that he has been "adversely affected by an *anticompetitive* aspect of the defendant's conduct." *Atlantic Richfield Co. v. USA Petroleum, Co.,* 495 U.S. 328, 339 (1990) (emphasis in the original). "'An antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." *Mathews v. Lancaster General Hospital*, 87 F.3d 624, 641 (3d Cir. 1996)(*quoting Tunis Bros. Co., Inc. v. Ford Motor Co*., 952 F.2d 715, 728 (3d Cir.1991)). Recovery by a private plaintiff on an antitrust claim can only be had where the loss "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 344 (1990).

Assessing antitrust injury necessarily involves consideration of the relevant product and geographic markets. *See Bocobo v. Radiology Consultants of South Jersey, P.A.,* 305 F. Supp. 2d 422, 425 (D.N.J. 2004), *aff'd,* 477 F. App'x 890 (3d Cir. 2012). Plaintiff has the burden of defining both of these markets. *See Queen City Pizza v. Domino's Pizza,* 124 F.3d 430, 436 (3d Cir. 1997); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

In his First Amended Complaint, Plaintiff defined the relevant market as "the provision of general surgical services involving the use of hospital facilities in Somerset." (FAC ¶100,

ECF No. 49.) *See also id*. ¶ 112 (alleging that the "concerted action of Defendants … produced an anti-competitive effect by limiting or excluding [Plaintiff] for providing general surgical services involving hospital facilities in Somerset").

Plaintiff seems to have refined that definition, somewhat, for summary judgment purposes; in his papers in opposition to the pending motion, he appears to define the relevant product markets as general surgery ("GS") services and certain gastrointestinal ("GI") surgical services[6] within a community hospital setting. (*See* Pl.'s Br. Opp. Summ. Judg. 29-33, ECF No. 176.) Notably, Plaintiff's product market definition, which is based on the report of Dr. Stephen Foreman (ECF No. 175-1), specifically excludes GS and GI services provided at tertiary care facilities like Conemaugh. Plaintiff defines the relevant geographic market as the seventeen-zip-code-area from which Somerset Hospital derives 90 percent of its patient base. (Pl.'s Br. Opp. Summ. Judg. 30-33.)

Defendants contend that Plaintiff's market definition is implausible because Conemaugh is clearly a direct competitor of Somerset Hospital's with respect to general surgical services (including GS and GI surgical services that could be performed by Plaintiff) and, therefore, it cannot reasonably be excluded from the relevant market definition. Because Plaintiff continues to actively practice surgery at Conemaugh, Defendants reason that he cannot show antitrust injury sufficient to confer antitrust standing.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *U.S. Horticultural Supply v. Scotts Co.,* 367 F. App'x 305, 309 (3d Cir. 2010)

---

[6] Plaintiff's reference to "GI Services" includes "a variety of surgical procedures, including some provided by other medical professionals, such as esophagogastroduodenoscopies ('EGDs') and colonoscopies" which Plaintiff is able to perform and which Defendant Saadat, as a GI doctor, would also perform. (Pl.'s Br. Opp. at 2, 4, and 32, ECF No. 176.)

(quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962)). "'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively.'" *Id.* (*quoting Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 206 (3d Cir. 1994)).

The relevant geographic market is "the area in which a *potential* buyer may rationally look for the goods or services he or she seeks." *U.S. Horticultural Supply,* 367 F. App'x at 311 (citation omitted) (emphasis in the original). Accordingly, "the geographic market is not comprised of the region in which the seller attempts to sell its product, but, rather, is comprised of the area where customers would look to buy such a product." *Id.* (*citing Tunis Bros. Co.*, 952 F.2d at 726).

Having carefully reviewed the record, the Court agrees with Defendants that Plaintiff's market definition is insufficient as a matter of law. Plaintiff takes the position that "[t]he general surgical market is derived from the larger Hospital market" (Pl.'s Br. Opp. 31, ECF No. 176), and "Somerset could only theoretically compete with other hospitals to the extent that both hospitals offer the same service to a consumer/patient." (Id. at 29.) Plaintiff claims that, because of their larger sizes, broader range of services, including certain specialty services, and status as a teaching hospital, larger tertiary care hospitals such as Conemaugh and Altoona Regional are not competitors of Somerset Hospital; according to Plaintiff, these larger tertiary care hospitals provide substitute services for Somerset Hospital, but Somerset does not provide substitute services for the larger tertiary care hospitals. (Id. at 29-30.) "As such," Plaintiff concludes, "tertiary care hospitals are not in the same product market as community hospitals like Somerset." (Id. at 30.)

While it may be true that Somerset cannot compete with larger facilities like Conemaugh when it comes to providing more specialized tertiary care services or drawing patients from the Johnstown area (see Foreman Report ¶¶ 62-68, ECF No. 175-1), the question is, with respect to the type of surgical services Plaintiff seeks to provide, whether Conemaugh acts as a reasonable substitute for Somerset Hospital; Plaintiff admits that it does. (*See* Pl.'s Br. Opp. 29-30 (noting that "Conemaugh or Altoona Regional provide substitute services for Somerset [Hospital]," even though Somerset Hospital cannot provide substitute services for the broader range of patient services offered by these tertiary care hospitals). The essence of Plaintiff's antitrust claims is his complaint that he has been excluded from providing general surgical services (and certain GI surgical services) to the patient base which he used to serve while practicing at Somerset Hospital. Since Plaintiff now provides those surgical services in a larger, more comprehensive facility, the Court finds no rational basis in the record for concluding that the general/GI surgical services offered at Conemaugh are not reasonable substitutes for those same types of services offered at Somerset Hospital. The fact that Conemaugh may offer more comprehensive services than Somerset Hospital does not change the fact that, with respect to the type of services offered by Somerset, Conemaugh's services overlap with those of Somerset Hospital and are reasonable substitutes (if not superior). In sum, Plaintiff's product market definition, premised on Dr. Foreman's report, provides no rational basis for distinguishing between GS/GI surgical services in the community hospital setting and GS/GI surgical services in the larger facilities like Conemaugh. *See, e.g., U.S. v. Carilion Health Sys.,* 707 F. Supp. 840, 844 (W.D. Va. 1989) (tertiary hospitals competed with community hospitals for primary and secondary care).

The question then becomes, for purposes of geographic market analysis, where patients within Somerset Hospital's service area may rationally look for such services. *U.S. Horticulture*

*Supply,* 367 F. App'x at 311. As noted, "the geographic market is not comprised of the region in which the seller attempts to sell its product, but, rather, is comprised of the area where customers would look to buy such a product." *Id.* The evidence must "therefore speak to buyer behavior." *Id.*

According to patient flow data reported by hospitals to the Pennsylvania Health Care Cost Containment Council (the "Council"), 21.6% of patients in what the Council defined as Somerset Hospital's primary service area went to Conemaugh in 2005 for inpatient general surgery services, and approximately 22.36% went to other hospitals for inpatient surgery; thus, approximately 44% of the patients were admitted to hospitals other than Somerset Hospital. (ECF No. 177 ¶¶ 30-31.) In fact, as Plaintiff's expert recognizes, even within the ten mile radius and 17-zip-code-area from which Somerset Hospital draws 90% of its patients, more than 32% of these patients are admitted to Conemaugh, Meyersdale, and Windber. (Id. ¶ 33.) Thus, purchasers of GS and GI services can rationally be expected to look for such services in locations outside of Somerset Hospital and the community hospital market. Indeed, as Plaintiff's own expert recognizes, "[s]ome of the services at Conemaugh may be reasonable substitutes for Somerset Hospital for residents of Somerset" even though "Somerset Hospital is not a reasonable substitute for Conemaugh for residents of Johnstown." (Foreman Report ¶ 68, ECF No. 175-1.) Accordingly, the relevant geographic market cannot rationally be defined to exclude Conemaugh. *See Untracht v. Fikri,* 454 F. Supp. 2d 289, 310 n.11 (W.D. Pa. 2006) (in antitrust case stemming from revocation of doctor's privileges at Lee and Conemaugh, court noted that, at a minimum, Lee, Conemaugh and Windber constituted part of the relevant geographic market and "one could easily argue the relevant geographic market includes surrounding areas such as Greensburg, Indiana, Somerset and even Pittsburgh."); *Urdinaran v. Aarons,* 115 F. Supp. 2d

484, 490 (D.N.J. 2000) (court concluding that relevant geographic market might well include Philadelphia, which was approximately one hour's drive from Atlantic City Hospital); *Korshin v. Benedictine Hosp.,* 34 F. Supp. 2d 133, 140 (N.D.N.Y. 1999) (market included hospitals physician could practice at that were no more than 31 miles away).

Conemaugh's status as a competitor of Somerset Hospital is supported by other undisputed evidence as well. There is no dispute that Conemaugh is regional hospital located approximately 32.5 miles to the north of Somerset and draws its patients from numerous counties, but primarily from Cambria and Somerset Counties. (ECF No. 177, ¶ 12, ¶ 20.) Its network of community hospitals includes Meyersdale, located to the south of Somerset Hospital. (Id. ¶23-24.) According to Google Maps, Conemaugh is 41.6 miles from Meyersdale on U.S. Route 219, which passes through Somerset. (Id. 24.) *See Gordon v. Lewistown Hosp.*, 272 F.Supp.2d 393, 429 n. 34 (M.D. Pa. 2003) (holding a court may take judicial notice of driving distances disclosed on an Internet mapping service and identifying like facilities within a 36 mile driving distance), *aff'd,* 423 F.3d 184 (3d Cir. 2005). Thus, Somerset Hospital is situated between Conemaugh and Meyersdale, both of which draw patients from the Somerset area.

Conemaugh advertises its services on billboards, on television, and in newspapers in the Somerset area, and it is listed in the Somerset telephone directory along with other hospitals offering general surgery services, such as Meyersdale, Windber, and Western Maryland Health System in Cumberland Maryland, and the UPMC hospitals located in Pittsburgh. (Id. ¶27-29.) Conemaugh's regular advertisements in Somerset newspapers include, among other things, ads for Conemaugh Valley Surgeons, a group of ten general surgeons employed by Conemaugh. (Id. ¶¶ 25-26.) In the years 2006 and 2007, surgeons at Conemaugh performed more than three times the number of surgeries that were performed at Somerset Hospital and more than four times the

number of endoscopies that were performed at Somerset Hospital.  (ECF No. 177, ¶¶17-18.)  As noted, patient flow data indicates that patients from Somerset's service area are admitted to Conemaugh for general surgery services.  Thus, purchasers of GS and GI services can rationally be expected to look for such services in locations outside of Somerset Hospital and the community hospital market.[7]  To the extent Plaintiff is essentially attempting to define a market that consists only of Somerset Hospital's patient base, he has defined the market too narrowly.  *See Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 877-78 (3d Cir. 1995) (citing cases and noting that "every court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services, a physician may not limit the relevant geographic market to a single hospital").

Plaintiff's own professional practice is illustrative of the competition that exists between Conemaugh and Somerset Hospital with respect to GS and GI services.  Since 1998, Plaintiff has been a member of Conemaugh's active medical staff and has held full surgical privileges there, while maintaining an office in very close proximity to Somerset Hospital.  (ECF No. 177 ¶11.)  During the seven years that he held privileges at both Somerset Hospital and Conemaugh, Plaintiff performed surgeries at both facilities.  Plaintiff acknowledges that he scheduled surgeries at Conemaugh based partly on the relative capabilities of both hospitals.  (Id. ¶ 13.)  For example, when Somerset Hospital placed a moratorium on bariatric surgeries due to concerns over Plaintiff's and another surgeon's pre-operative treatment of patients, Plaintiff moved all of his bariatric surgeries to Conemaugh.  (Id. ¶14.)  Plaintiff acknowledges that, in his surgical practice, he is able to offer all of the services provided at Somerset Hospital, plus

---

[7] The record shows that Conemaugh is competitive with Somerset Hospital in other non-tertiary care settings as well.  In 2012 it acquired the primary care practice of Ann Smith, M.D., a former family doctor who practiced at Somerset Hospital and was president of its medical staff.  Since this acquisition, Dr. Smith's former patients are now being served by physicians affiliated with Conemaugh.  (ECF No, 177, ¶22; Farrell Suppl. Aff. ¶4, ECF No. 164.)

additional services that Somerset Hospital does not offer. (ECF No. 177, ¶ 37.) Plaintiff also acknowledges that some of the surgeries he performed at Conemaugh were based on patient preference, which indicates that some surgical patients prefer the services of a regional hospital. Indeed, the whole premise of Plaintiff's theory as to why Farrell wanted to terminate his privileges is that Plaintiff, while on staff at Somerset Hospital, was performing surgeries at Conemaugh that Farrell believed could and should have been performed at Somerset. Thus, Plaintiff's antitrust theory demonstrates that Somerset Hospital competes with Conemaugh in the market for GS and GI services.

Presently, Plaintiff maintains an office in Somerset[8] and serves as President of the Somerset County Medical Society. (ECF No. 177, ¶¶ 1, 107.) Plaintiff continues to hold privileges at Conemaugh and admits that the vast majority of his client base comes from Somerset and Cambria Counties. (ECF No. 177, ¶¶ 35-36.) In the years 2006 through 2008, Plaintiff performed (respectively) 417, 352, and 475 surgical procedures at Conemaugh. (Id. ¶ 34.)

In sum, the Court finds that the evidence of record cannot reasonably be construed to reach the conclusion that Conemaugh is *not* a competitor of Somerset Hospital with respect to the market for GS and GI surgical services served by Somerset Hospital. Because Plaintiff's definition of the applicable product and geographic markets is premised on this flawed assumption, he has failed, as a matter of law, to sustain his burden of proof with respect to this issue. *See Queen City Pizza, Inc.,* 124 F.3d at 436 (where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of

---

[8] According to mapquest, Plaintiff's office, located at 223 South Pleasant Avenue in Somerset, is less than one half mile from Somerset Hospital.

demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and the complaint should be dismissed). The Court is inclined to agree with Defendants that, at minimum, the relevant product and geographic markets must include those GS and GI surgical services provided at Conemaugh (including the surgical services provided by Plaintiff) and Meyersdale, Conemaugh's "feeder" hospital.[9]

Here, Plaintiff has failed to demonstrate that his injury "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co.,* 495 U.S. at 344. The evidence does not support a reasonable finding that Plaintiff was shut out of the relevant market. As noted, Plaintiff is actively practicing surgery at Conemaugh, draws patients from Somerset County, and maintains an office in close proximity to Somerset Hospital. *See Bocobo v. Radiology Consultants of South Jersey, P.A.,* 477 F. App'x 890, 897-98 (3d Cir. 2012) (radiologist's loss of privileges at New Jersey hospital did not confer antitrust standing where, within two weeks he was hired by hospital in Philadelphia); *Untract v. Fikri,* 454 F. Supp. 2d 898, 309-10 (W.D. Pa. 2006), *aff'd* 249 F. Appx. 268 (3d Cir. 2007) (general surgeon's loss of privileges at Lee and Conemaugh hospitals did not state antitrust injury where he still maintained the option of practicing at Windber Hospital and was therefore not shut out of the relevant market).

---

[9] Plaintiff insists that market definition is an issue of fact that must be decided by the jury. Although market definition may generally be a question of fact, the Court is not persuaded that the record in this case can support a genuine dispute with respect to the definition supplied by Plaintiff's expert. *See Bocobo v. Radiology Consultants of South Jersey, P.A.,* 477 F. App'x 890, 897 n.6 (3d Cir. 2012) (rejecting plaintiff's objections to the District Court's act of defining the relevant product and geographic markets rather than preserving that question for the jury and holding that "[i]t was proper for the District Court to delimit the market in order to assess antitrust injury at the summary judgment stage").

Nor has Plaintiff demonstrated harm to competition as a result of Defendants' allegedly unlawful practices. As we discuss in more detail below, the record does not support a finding that there was a change in the price, quantity, or quality of general surgical services in the relevant product and geographic market in connection with the termination of his privileges. As Defendants observe, the Plaintiff's own loss of personal income is not antitrust injury sufficient to support antitrust standing. *See Huhta v. Children's Hosp. of Phila.,* No. CIV. A. 93–2765, 1994 WL 245454, *2 (E.D. Pa. May 31, 2004) (harm to plaintiff doctor in the form of lost referrals was not harm to competition within the marketplace for purposes of establishing antitrust injury). Because Plaintiff cannot demonstrate antitrust injury, he lacks standing to pursue his antitrust claim, and Counts I through III fail as a matter of law for this reason alone.

### 2. Section 1 of the Sherman Act (Count I)

Assuming Plaintiff could demonstrate antitrust standing, the Court finds that his claim in Count I of the complaint nevertheless fails as a matter of law on substantive grounds. Under Section 1 of the Sherman Act, a plaintiff must establish that the defendant was a party to a "contract, combination … or conspiracy" that "imposed an unreasonable restraint on trade." 15 U.S.C. § 1[10]; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314–15 (3d Cir.2010). To establish a §1 violation, a plaintiff must prove:

> (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.

---

[10] Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A private right of action for violations of the Sherman act is created by 15 U.S.C. §15.

*Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir. 2005); *Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 639 (3d Cir. 1996). Failure to satisfy any one of these elements precludes a plaintiff from establishing a viable restraint-of-trade claim. *See Gordon,* 423 F.3d at 207 ("Without proof of all of these elements, a Section 1 claim cannot be maintained.").

a. Unlawful Concerted Action

"The very essence of a section 1 claim … is the existence of an agreement." *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 639 (3d Cir. 1996) *(quoting Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999 (3d Cir.1994)). Thus, a "'unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger section 1 liability." *Id.* (quoting *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, (1984)). "Unilateral action, no matter what its motivation, cannot violate [section] 1." *Id.* (*quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 110 (3d Cir.1980)). Concerted action is shown where two or more distinct entities have agreed to take action against the plaintiff. *Gordon,* 203 F.3d at 207 (citation omitted). "Accordingly, it requires proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator." *Id. (citing Big Apple BMW, Inc. v. BMW of North Am. Inc.,* 974 F.2d 1358, 1364 (3d Cir.1992)).

Moreover,

[w]hen the question involves concerted action, the non-movant may rely solely on circumstantial evidence and the reasonable inferences drawn therefrom to withstand summary judgment. .... But this requires more than mere complaints of concerted action. There must be evidence that tends to exclude the possibility of independent action, meaning that the evidence reasonably tends to prove that the

alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective. *See Big Apple BMW*, 974 F.2d at 1364, *citing Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L.Ed.2d 775 (1984); *Alvord–Polk*, 37 F.3d at 1001. This is because mistaken inferences in this context may serve to chill the very conduct that the antitrust laws are designed to protect. *Alvord–Polk*, 37 F.3d at 1001 (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Monsanto*, 465 U.S. at 763–64, 104 S. Ct. 1464). If such a showing is made, the movant bears the burden of proving that drawing an inference of unlawful behavior is unreasonable. *Id*. Evidence of conduct that is as consistent with permissible competition as with illegal conspiracy, without more, will not support an inference of conspiracy. *Alvord–Polk*, 37 F.3d at 1001. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Gordon*, 423 F.3d at 208.

Here, Plaintiff theorizes that each of the named Defendants sought revocation of his privileges for anticompetitive reasons and agreed to work together toward that end. According to Plaintiff: "Farrell had an extreme dislike of [him] and was infuriated by his treatment of patients at other healthcare institutions" (Pl.'s Br. Opp. 40); Go allegedly wanted the Hospital to contract with a hospital-based physician in order to promote his own financial gain; Saadat allegedly wanted Plaintiff removed from the Hospital in order to reduce competition for GI services; and the Hospital allegedly desired his ouster so as to eliminate the ability of patients to receive GS and GI services elsewhere, thereby increasing the Hospital's revenue. (Id.) After careful review of the record, the Court finds there is insufficient evidence to support a genuine issue of fact as to an actionable conspiracy under Section 1 of the Sherman Act.

With respect to Defendant Go, the evidence establishes little more than his presence at various meetings of the MEC during the time that Plaintiff's surgeries were under review. Plaintiff points to the fact that, at the MEC's September 21, 2005 meeting, Go brought operating room schedules from the ICD surgeries, allegedly to demonstrate his view that Plaintiff had

described the surgeries improperly on the schedules.  Plaintiff further points to the fact that both

Go and Saadat voiced their opinions at that meeting that Plaintiff's performance of the surgeries

constituted bad judgment.  (See Pl.'s Ex. O, ECF No. 175-15.)  This evidence cannot logically be

viewed as an indication of any intent on the part of Go (or Saadat) to engage in anticompetitive

activity, particularly in view of the fact that the MEC ultimately expressed disagreement with the

Board's revocation of hospital privileges and Go personally abstained from voting on the matter

of revoking Plaintiff's privileges.  Moreover, the minutes from the MEC's September 21 meeting

do not support an inference that Go tried to unfairly manipulate the proceedings; the minutes

state only that:

> ... the OR schedules were provided by Dr. Go for the committee which show that
> the OR schedule was for Pacemaker Battery Change on 8/9/05.  Then on 8/16/05
> the scheduled procedure was Pacemaker Battery Change (Pacemaker
> Replacement) Defibrillator Recall.  Neither indicated the true procedure to be
> performed.

(Pl.'s Ex. O, ECF No. 175-15.)  Even if Go did express a view that Plaintiff had improperly

described the surgeries, such a view is supported by the evidence and, in any event, does not tend

to exclude the possibility that Go acted independently for reasons unrelated to anticompetitive

interests.  As for Go's and Saadat's statement of opinion that Plaintiff had exercised poor

judgment with respect to the ICD surgeries, this statement of opinion was expressed by every

member of the MEC at the September 21, 2005 meeting.  Accordingly, Go's actions at the

September 21, 2005 MEC meeting do not constitute evidence of an intent to engage in unlawful

anticompetitive activity.

Plaintiff also points to evidence which, he claims, demonstrates that Farrell and Go

communicated about the Hospital hiring a general surgeon as an employee and about the ultimate

hiring of Dr. Pradhan, a general surgeon employed by the Hospital.  Plaintiff also points to a July

13, 2006 email from Farrell which, according to Plaintiff, shows that Go had attempted to undermine Plaintiff while he was still practicing at Somerset Hospital. The email in question states, in relevant part:

> The staff really like Pradhan. I picked up that Peter is beginning to get defensive and jealous and Joe confirmed Peter is less than cordial with Pradhan and very short with OR staff! He is starting the undermining as he did with Belic, Novak and Pendrack! I will watch and have a down to Jesus meeting with Peter!"

(Pl.'s Ex. BB, ECF No. 175-28.) Nothing about this evidence is suggestive of a "conscious commitment" on the part of Go "to a common scheme designed to achieve an unlawful objective" with respect to Plaintiff. *Gordon*, 423 F.3d at 208. Again, the evidence shows that Go did little more than attend MEC meetings while abstaining from voting on any decision relative to the revocation of Plaintiff's hospital privileges. There is no evidence to suggest that he attended board meetings or attempted to influence the votes of other physicians or board members. Because there is no evidence to establish conspiratorial activity on the part of Go, Plaintiff's §1 claim against him fails as a matter of law.

The record is similarly deficient with respect to Defendant Saadat. The record shows that Saadat was present at Board meetings on November 14, 2005 to discuss the MEC report and on May 31, 2006 when the Board considered the Fair Hearing Panel's recommendation and voted to affirm its revocation decision. (ECF No. 182, ¶¶ 196, 240.) However, Saadat's mere presence at the Board's meetings does not give rise to an inference of an antitrust conspiracy. *Mathews,* 87 F.3d at 640. Nor does Saadat's discussion of the MEC report give rise to such an inference, absent evidence – not present here -- that he tried to lobby the Board for an adverse decision. *See Mathews,* 87 F.3d at 639 ("Where a hospital board has ultimate decision making authority, '[s]imply making a peer review recommendation does not prove the existence of a conspiracy

[among the hospital and its staff]; there must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation.'") (alterations in the original) (citation omitted). In fact, the only evidence showing Saadat's attempt to influence the Board comes in the form of his March 23, 2006 letter, in which he urged the Board to reconsider its revocation of Plaintiff's hospital privileges and which Plaintiff's counsel offered on his behalf at the fair hearing proceedings. In light of the foregoing considerations, no reasonable inference of a §1 conspiracy involving Saadat can be established.

Nevertheless, in attempting to show Saadat's involvement in the alleged conspiracy, Plaintiff points to Farrell's letters to Saadat of September 6 and 7, 2005 setting forth the manner in which the MEC should conduct itself pursuant to the review action process. Plaintiff has also proffered an email from Farrell noting how Saadat "set a good tone" at a November 22, 2005 meeting with medical staff at which Farrell read the Board's resolution to revoke Plaintiff's privileges and "did not let anyone get away with half-truths or innuendos." (Pl.'s Ex. DDD, ECF No. 175-55.) Having carefully considered this evidence, the Court finds that it does not logically support an inference of unlawful conspiratorial intent, as the evidence is perfectly consistent with a spirit of truth-seeking and adherence to the established bylaws procedures. *See Mathews,* 87 F.3d at 640 (noting that peer review actions, when properly conducted, "generally enhance competition and improve the quality of medical care" and are therefore pro-competitive; "[w]e are reluctant to draw inferences of an antitrust conspiracy from ambiguous circumstantial evidence in cases where the challenged activity promotes competition."). *See also Matsushita Electric Industrial Co*., 475 U.S.at 597 n. 21 (Evidence of conduct, which is "as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

Similarly insufficient is Plaintiff's proffer of a January 6, 2006 email from Farrell to his attorneys and certain Board members, in which Farrell discusses a proposed settlement that he was considering during the course of the fair hearing process. In relevant part, the email contemplates a proposal that Plaintiff "complete[ ] a new and clean application for Medical Staff privileges limited strictly to General Surgery; no vascular, no devices (including ICD and Pacemakers), and endoscope maybe depending on Dr. Saadat." (Pl.'s Ex. TTT, ECF No. 175-71.) This statement does not support a reasonable inference that Saadat and Farrell were consciously working together to oust Plaintiff from the Hospital for anticompetitive reasons. Farrell's statement is made in the context of expressing his opinion that Plaintiff is skilled in the area of general surgery but has problems outside of that area. (Id.) Accordingly, it is consistent with a lawful concern about the quality of patient care and does not give rise to an inference of anticompetitive motive, even to the extent it implicates conduct on the part of Saadat.[11]

In sum, Plaintiff has not produced evidence that tends to exclude the possibility that Saadat acted independently of the other named Defendants, and for lawful reasons, in the above-referenced matters. *See Mathews,* 87 F.3d at 640-41 (court "reluctant to infer antitrust conspiracy" where plaintiff "has not produced evidence that tends to exclude the possibility that the Board acted independently" in taking professional review action against him). *See also*

_____

[11] Plaintiff also references an email from Farrell which allegedly demonstrates that Farrell instructed Saadat, in his capacity as President of the medical staff, how to handle certain motions passed at a general medical staff meeting. Specifically, Plaintiff contends the email demonstrates that Farrell instructed Saadat how to have the motions referred to the Board and how to then "report back to the [medical] staff the item is following its normal course of action as recommendations to the Board from the Medical Staff." (Pl.'s Br. Opp. 15, ECF No. 176; *see also* ECF No. 182, ¶224, referencing Pl.'s Ex. WWW). The Court notes that Exhibit WWW does not appear to be part of the record and, consequently, the Court is unable to review that document. In any event, however, based on the Plaintiff's description of the evidence, the Court would not be inclined to view this email as evidence of unlawful conspiratorial activity.

*Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768 (1984) ("[T]here must be evidence that tends to exclude the possibility of independent action.").

Much of the evidence proffered by Plaintiff involves emails sent or received by Farrell to the Hospital's legal counsel and/or other administrators or board members.  This evidence also fails to establish the basis for an actionable conspiracy.  To assert a viable claim under Section 1 of the Sherman Act, Plaintiff must demonstrate concerted activity on the part of at least two actors pursuing separate economic interests. *See American Needle, Inc. v. National Football League,* 560 U.S. 183, 195 (2010) ("The relevant inquiry [under 15 U.S.C. §1] is whether there is a 'contract, combination ... or conspiracy' amongst 'separate economic actors pursuing separate economic interests,' ... such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' ..., and therefore of 'diversity of entrepreneurial interests,' ... and thus of actual or potential competition.'")(internal and concluding citations omitted).  Plaintiff has not attempted to demonstrate an economic interest on the part of the Hospital's legal counsel for purposes of establishing a conspiracy, and Farrell could not conspire with the Board or other administrators as a matter of law because, functionally, they are all part of the same entity, *i.e.*, Somerset Hospital.  *See McMorris v. Williamsport Hosp.,* 597 F. Supp. 899, 914 (M.D. Pa. 1984) ("It is generally agreed that officers, agents and employees of a business are legally incapable of conspiring among themselves or with their firm in violation of Section 1.") (internal citations omitted).  *See also American Needle, Inc.,* 560 U.S. at 195 (noting that, "while the president and a vice president of a firm could (and regularly do) act in combination, their joint action generally is not the sort of 'combination' that § 1 is intended to cover," because "[s]uch agreements might be described as 'really unilateral behavior flowing

36

from decisions of a single enterprise.'") (citation omitted); *Weiss v. York Hosp.,* 745 F.2d 786, 814-15 (3d Cir. 1984) (hospital cannot legally conspire with its medical staff).

For all of the foregoing reasons, Plaintiff has failed to produce evidence sufficient to support a finding of concerted action on the part of the Defendants. Accordingly, his claim under Section 1 of the Sherman Act fails as a matter of law.

### b. Unreasonable Restraint on Trade

"The second requirement of a Section 1 claim, an unreasonable restraint on trade, is analyzed under either the *per se* standard or the rule of reason standard." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). The *per se* illegality rule "applies when a business practice 'on its face, has no purpose except stifling competition.'" *Id.* (*quoting Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir.2001)). "*Per se* illegality 'is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Id.* at 222 (*quoting Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir.2010) (citations and internal quotation marks omitted); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010)). No *per se* illegality is alleged or supportable on this record.

Agreements that do not fall under *per se* illegality are analyzed under the "rule of reason" to determine whether they are an unreasonable restraint on trade. *Burtch,* 662 F.3d at 222. "'The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anticompetitive effects within the relevant product and geographic markets.'" *Deutscher Tennis Bund v. ATP Tour, Inc.,* 610 F.3d 820, 830 (3d Cir.

2010) (*quoting United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)). "'The plaintiff

may satisfy this burden by proving the existence of actual anticompetitive effects,' or defendant's

market power." *Id.* (*quoting Brown*, 5 F.3d at 668). "'If a plaintiff meets his initial burden of

adducing adequate evidence of market power or actual anti-competitive effects, the burden shifts

to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive

objective.'" *Id.* (*quoting Brown, supra*, at 669. "'To rebut, the plaintiff must demonstrate that

the restraint is not reasonably necessary to achieve the stated objective.'" *Id.* (quoting Brown, 5

F.3d at 668).

Here, Plaintiff has failed to proffer proof demonstrating a genuine issue of fact with

respect to anticompetitive effect on the relevant market for GS and GI surgical services -- such as

a reduction of output, an increase in price, or deterioration in the quality of goods or services --

since his departure from Somerset Hospital. No evidence exists to show that patients, insurers,

or the government paid more for general surgical services in market that includes Somerset

Hospital as the result of the alleged anticompetitive conduct, and the record indicates that

Somerset Hospital did not raise the price of its surgical services in connection with Plaintiff's

departure. (*See* Farrell Dep. Vol. II, 161-162, ECF No. 81-24 at 1-2.) Similarly, the record does

not support a reasonable finding that Plaintiff's loss of privileges affected the quantity or quality

of general surgical services available to consumers. Although Somerset Hospital functioned

with only one general surgeon (i.e., Defendant Go) rather than two during the 7 to 8 month

period when Plaintiff's loss of privileges was under an internal appeals process, patients in

Somerset's service area at all times had the option of selecting Plaintiff to perform their surgical

procedures at Conemaugh. Moreover, it is undisputed that Conemaugh added a second general

surgeon in July 2006 (the same month that Plaintiff's loss of privileges became final), when Dr.

Pradhan was recruited. Since that time, Somerset Hospital has consistently maintained two or three general surgeons on its staff -- the same number that the Hospital had prior to Plaintiff's loss of privileges. (*See* Farrell Supp. Aff ¶ 9, ECF No. 164.) Consequently, there has not been a decrease in the quantity or supply of surgical services available to those living in and around Somerset; if anything, as Defendants point out, there is greater competition because Somerset Hospital is staffed at its previous level for surgeons (or higher) and Plaintiff now competes with Somerset by practicing full time at Conemaugh. Moreover, because Plaintiff has been available at all times to provide his surgical services at Conemaugh, a larger and more comprehensive hospital, it also stands to reason that there has been no decrease in the quality of surgical services available to Somerset area patients, because patients can still avail themselves of his surgical skills.

In an attempt to demonstrate anticompetitive effects, Plaintiff asserts that the price per bed at Somerset is substantially higher than the room rates at all other regional community hospitals and many regional tertiary care hospitals as well; according to Plaintiff, this indicates that Somerset Hospital has market/monopoly power within the community hospital market. This assertion is based on Dr. Foreman's report, which cites data reportedly taken from a Pennsylvania Department of Health questionnaire. As Defendants point out, however, there is no evidence of record establishing that patients or their insurance carriers actually pay the stated charges at any of the hospitals identified by Dr. Foreman, or that Somerset Hospital charges more for the same services. (*See* ECF NO. 182, Defs.' Resp. to ¶304.) Assuming they do, however, the data cited by Dr. Foreman indicates that patients and insurance carriers would pay a higher *per diem* room rate for surgery at Conemaugh (i.e., $750 per day) than they would pay at Somerset Hospital (i.e., $690). Because the Court finds that Conemaugh cannot rationally be

excluded as a competitor in the market for general surgical services, this evidence is relevant and, by Plaintiff's logic, would seem to suggest that it has greater market power than Somerset Hospital has. Defendants further note that there is no evidence in the record to suggest that Somerset Hospital has been able to increase its prices relative to surgical services as a result of Plaintiff's loss of privileges. (*See id.*) *See Urdinaran v. Aarons*, 115 F. Supp. 2d 484, 489 (D.N.J. 2000) (noting that, "[b]ecause medical fees are largely dictated by health insurance companies, Medicaid, and Medicare, courts have looked at other indicia of anticompetitiveness, such as the quality of care, which is often determinative for consumers of medical services").

Plaintiff argues that his ouster from Somerset Hospital harmed the market because consumers, including his long-time patients, were denied the freedom to choose between their long-time, board-certified physician and, instead, could only turn to Dr. Go for general surgery or Dr. Saadat for GI services. However, Plaintiff at all times continued to practice at Conemaugh, located approximately 40 to 45 minutes from Somerset Hospital, and patients could avail themselves of his services at that facility. Moreover, Somerset Hospital hired Dr. Pradhan in 2006 and, as noted, has maintained two or three general surgeons on staff since that time, allowing patients in the Somerset area at least as many, if not more choices, than they had prior to Plaintiff's loss of privileges.

Plaintiff also contends that the Defendants caused competitive harm to the population of inmates at SCI-Laurel Highlands ("SCI-LH"), who comprised a substantial number of his patients during the time he practiced at Somerset Hospital. Plaintiff asserts that the Hospital controls the market for surgical procedures to these inmates and, by revoking his privileges, it effectively barred Plaintiff from competing in the market to provide inmate surgeries, while reducing the quality of care available to them. Further, Plaintiff claims the Hospital forcibly

transferred Plaintiff's market share of these inmates to Drs. Go and Saadat.  However, Plaintiff's

assumption that the Hospital controls the market for surgical procedures to inmates is

unsupported by any competent evidence in the record and, in fact, is contradicted by Farrell's

testimony.  According to Farrell's unrebutted testimony, Somerset Hospital has a non-exclusive

contract with Physician and Healthcare Services ("PHS"), the entity responsible for contracting

for health services to prisoners, and PHS can therefore send prisons to other facilities, including

Conemaugh.  (ECF No. 182, Defs.' Resp. to ¶ 355.)  Moreover, there appears to be no evidence

in the record establishing that Defendant Go's or Saadat's patient volumes increased at all as a

result of Plaintiff's loss of privileges at Somerset Hospital, or that those volumes increased

specifically as a result of treating inmates at SCI-LH.  Further, the fact that PHS could contract

with other hospitals and the fact that Somerset Hospital has maintained 2 to 3 general surgeons

on staff since July 2006 establishes that there was no reduction in the supply or quality of

surgical services available to inmates of SCI-Laurel Highlands.

Anticompetitive effect may also be shown by providing evidence of the Defendants'

market power.  "Market power is the power to force a purchaser to do something that he would

not do in a competitive market… [i.e.] the ability of a single seller to raise price and restrict

output." *Eastman Kodak co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (citation

omitted).  *See also Untracht v. Fikri,* 454 F. Supp. 2d 289, 313 (W.D. Pa. 2006) (defining

"market power" as the "'ability to raise prices above those that would prevail in a competitive

market'") (quoting *Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 276 (3d Cir. 1999)).

Plaintiff has attempted to demonstrate that Somerset Hospital, Dr. Saadat and Dr. Go all

have market power.  Plaintiff contends that the Hospital has market power because the market

for community hospital services within its seventeen-zip-code service area is monopolistic and

highly concentrated. Plaintiff similarly contends that the market for general surgical and GI surgical services within the same community hospital market and seventeen zip-code area is also highly concentrated. He argues that these concentrations increased after his ouster from Somerset Hospital.

For the reasons previously discussed, the Court finds that Plaintiff's market definition is not reasonably supported by the record as a whole insofar as it distinguishes separate product markets for general surgical services in the community hospital setting and like services in larger facilities such as Conemaugh. Plaintiff's market definition is further unsupportable insofar as it restricts the relevant geographic market so as to exclude GS and/or GI surgical services provided at Conemaugh and its affiliate hospital, Meyersdale. As Defendants observe, Plaintiff has performed hundreds of surgeries every year at Conemaugh since the loss of his privileges at Somerset Hospital, and this evidence tends to show, if anything, that Somerset Hospital faced more competition after the termination of Plaintiff's privileges than it did before because Plaintiff has been competing against it ever since on a full-time basis. In addition, the record establishes that Somerset Hospital competes with numerous other Conemaugh surgeons who advertise regularly in the Somerset area. Given all this, the Court is inclined to agree with Defendants that, based on the undisputed evidence in the record, Plaintiff cannot logically contend that Somerset Hospital, with its small number of surgeons and single gastroenterologist, could produce anti-competitive effects in the face of competition from Conemaugh.

Because Plaintiff's evidentiary proffers as to market concentration are based on unsupportable and implausible market definitions, while ignoring or discounting actual competition in GS/GI surgical services from Conemaugh and from Plaintiff himself, his proof is insufficient as a matter of law to establish an unlawful restraint of trade. *See Jame Fine*

*Chemicals Co., Inc. v. Hi-Tech Pharmacal Co., Inc.*, 44 F. App'x 602, 604-05 (3d Cir. 2002) (dismissal of Section 1 claim is appropriate where plaintiff fails to state a claim because it fails to adequately define the relevant market).

For the reasons discussed, the record does not support a genuinely disputed issue as to whether the Defendants conspired to achieve an unlawful restraint of trade. Accordingly, summary judgment will be entered as to Count I of the First Amended Complaint.

### 3. *Section 2 of the Sherman Act (Count II)*

Plaintiff's second cause of action asserts a violation of Section 2 of the Sherman Act, which prohibits monopolization, attempts to monopolize, and conspiracies to monopolize any part of interstate trade or commerce. *See* 15 U.S.C. §2 ("Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of [an offense and subject to penalties].").[12] In order to establish a violation of Section 2 of the Sherman Act two elements must be proven: (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *U.S. v. Dentsply Intern., Inc.,* 399 F.3d 181, 186 (3d Cir. 2005) (*citing Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992)).

"'Monopoly power under § 2 requires ... something greater than market power under § 1.'" *Id. (quoting Eastman Kodak Co.*, 504 U.S. at 481). Failure to establish a defendant's

---

[12] It is not entirely clear to this Court whether Plaintiff is asserting a claim of conspiracy to monopolize, but it would appear so, as Count II is asserted against Defendants Saadat and Go, as well as the Hospital. To the extent Plaintiff's Section 2 claim is being presented as a conspiracy to monopolize claim, the Court finds – for all the reasons discussed in relation to Count I – that the evidence of record does not support a reasonable finding of an agreement among the Defendants to violate Section 2 of the Sherman Act.

market power under §1 of the Sherman Act therefore precludes a finding of monopoly power for purposes of §2 of the Act. *See Urdinaran v. Aarons,* 115 F. Supp. 2d at 491 ("Because Plaintiff failed to establish that the Defendants had market power under Section 1, he necessarily fails to overcome the higher threshold required to satisfy monopoly power under Section 2."). Defendants contend that Plaintiff has failed to establish a violation of §2 of the Sherman Act, and this Court agrees.

In attempting to demonstrate that Defendants have monopoly power, Plaintiff primarily relies on proffered evidence of the Defendants' relative market share which, of course, presumes a plausible market definition. *See Weiss v. York Hosp.,* 745 F.2d 786, 827 (3d Cir. 1984) (noting that courts have used a defendant's market share as a "primary criterion… to assess the existence of monopoly power"). Relying on Dr. Foreman's report, Plaintiff maintains that Somerset Hospital has an 83 percent share of the community hospital market within the relevant seventeen-zip-code-area, demonstrating monopoly power. Reasoning that the market for GS/GI surgical services are derived from the community hospital market (i.e., Somerset Hospital), Plaintiff contends that Defendants Saadat and Go had a 100 percent market share of the GS/GI surgical services in the community hospital setting within the restricted 17-zip-code area by virtue of their status as the sole general surgeon and sole gastroenterologist on Somerset Hospital's staff, until the arrival of Dr. Pradhan in July 2006. Plaintiff further contends that the Defendants have exclusionary power because "[n]ew entry into the community hospital market would be difficult or impossible." (Pl.'s Br. Opp. 45, ECF No. 176.)

Plaintiff's Section 2 claim suffers from the same deficiencies as were discussed relative to his Section 1 claim. Plaintiff's definition of the relevant product and geographic markets is unsupportable to the extent it excludes, at the very least, GS and GI surgical services available at

Conemaugh and its affiliated hospital, Meyersdale. Because Plaintiff's definition of the relevant market is not rationally supported by the record as a whole, he has failed to demonstrate the existence of a genuinely disputed issue of fact with respect to the Defendants' relative market share and alleged monopoly power in support of his Section 2 claim. *See Queen City Pizza, Inc.*, 124 F.3d at 436 (antitrust claims may be dismissed for plaintiff's failure to adequately define the relevant market); *In re Neurontin Antitrust Litigation*, 2013 WL 4042460, *3 (D.N.J. Aug. 8, 2013) (proof of monopoly power for purposes of §2 of the Sherman Act requires definition of the relevant market).

"In order to survive a motion for summary judgment a plaintiff must produce economically plausible evidence supporting the elements of his claim." *Untracht*, 454 F. Supp. 2d at 311 (*citing Harrison Aire, Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374, 380 (3d Cir. 2005)). "'If the plaintiff's theory is economically senseless, no reasonable jury could find in [his] favor, and summary judgment should be granted.'" *Untracht*, 454 F. Supp. 2d at 311 (*quoting Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992)) (*also citing Harrison*, 423 F.3d at 380). Here, the uncontradicted evidence shows that patients from Somerset Hospital's service area receive care from Conemaugh, Windber, and Meyersdale as well as from Somerset Hospital. In 2006 and 2007, Conemaugh performed over 27,000 surgeries to Somerset Hospital's 7,184 surgeries and performed 13,440 endoscopies to Somerset Hospital's 2,728 endoscopies, drawing patients primarily from Somerset and Cambria Counties. Plaintiff personally performed hundreds of surgeries at Conemaugh each year between 2006 and 2008, drawing the vast majority of his patients from Somerset and Cambria Counties. As Defendants point out, it is illogical to conclude, based on the evidence of record, that Somerset Hospital, a small community hospital, has the power to control prices, which are established by the

government and the insurance industry, or to exclude competition from much larger hospitals like Conemaugh or other major hospitals in Greensburg, Indiana or Pittsburgh. Because a jury could not rationally find that Defendants monopolized or conspired or attempted to monopolize the relevant market for general surgery and GI surgery, Plaintiff's claim under Section 2 of the Sherman Act fails as a matter of law.

### 4. *Section 16 of the Clayton Act (Count III)*

Count III of the FAC asserts a claim for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. §26.[13]  (*See* FAC ¶¶ 125-28, ECF No. 49.)  To establish the need for injunctive relief under Section 16, a plaintiff must generally demonstrate:  (i)"a threat of loss"; (ii) that the injury in question "is of the type the antitrust laws were intended to prevent"; and (iii) "a significant threat of injury from a violation of the antitrust laws.  *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 317 (3d Cir. 2011).  *See also In re New Jersey Title Ins. Litig.,* 683 F.3d 451, 460 (3d Cir. 2012) ("To establish standing under Section 16, Appellants must 'demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.'") (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969)).

Plaintiff contends he has been "irreparably injured in, and has been threatened with irreparable injury to, his business and property as a direct and proximate result of the Hospital's past and ongoing violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2."  (FAC ¶ 127.)  As a result, Plaintiff seeks a reinstatement of his staff and clinical privileges at the Hospital, along with his costs of suit and a reasonable attorney's fee.  (Id., ¶ 128.)  Because

---

[13] Section 16 of the Clayton Act provides a cause of action for injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. §26.

Plaintiff has failed to demonstrate the existence of a valid antitrust violation under Counts I and II of the FAC, he is not entitled to injunctive relief under Count III. Accordingly, Defendant's motion for summary judgment will be granted as to this claim.

B. Plaintiff's State Law Claims

In light of this Court's disposition of Counts I through III of the FAC, Plaintiff's only remaining claims arise under state law. Count IV asserts a claim under Pennsylvania law for intentional interference with prospective contractual relationships, and Count V asserts a claim for breach of contract based on the Hospital's alleged failure to adhere to the requirements of the Medical Staff Bylaws.

The Court has only supplemental jurisdiction over these remaining claims, and a federal court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §1367(c)(3). Despite the age of this case and the protracted litigation that has occurred thus far, the Court notes that this Memorandum Opinion disposes of the more complicated legal and factual issues in the case. The Court further notes that discovery has been completed and the remaining state law claims are not unusually complex, such that trial should be able to proceed relatively expeditiously in state court without undue burden or prejudice to the parties. To the extent that the parties dispute the appropriate interpretation of Pennsylvania law in relation to Count IV of the First Amended Complaint, however, the Court notes that this issue is best decided by the Pennsylvania state courts. Moreover, notwithstanding Defendants' likely assertion of immunity under the Health Care Quality Improvement Act, 42 U.S.C. §§11101 *et seq.,* as a defense to Counts IV and V, "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense." *Vaden v.*

*Discover Bank,* 556 U.S. 49, 60 (2009) (citing *Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 152 (1908)). *See Urdinaran v. Aarons,* 115 F. Supp. 2d 484, 492 (D.N.J. 2000) (anticipated assertion of immunity under the HCQIA is insufficient to establish federal court's original jurisdiction over state law tort and contract claims). Accordingly, the Court finds no extraordinary circumstances to be present as might compel it to retain supplemental jurisdiction over Counts IV and V. *See Angeloni v. Diocese of Scranton,* 135 F. App'x 510, 515 (3d Cir. 2005) (when all federal claims have been dismissed on summary judgment, a district court should ordinarily refrain from exercising supplemental jurisdiction absent extraordinary circumstances) (citations omitted). Plaintiff's state law claims will therefore be dismissed without prejudice to be pursued in state court.

## IV. Conclusion

For the reasons stated above, Defendant's motion for summary judgment will be granted with respect to Plaintiff's federal antitrust claims and denied with respect to Plaintiff's state law claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims as set forth in Counts IV and V of the First Amended Complaint and, consequently, those claims will be dismissed without prejudice to be litigated in state court.

An appropriate order follows.

Date:  September 30, 2014

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Richard J. Cromer, Esquire
Manning J. O'Connor, II, Esquire
Timothy J. Lyon, Esquire
David R. Johnson, Esquire
William James Rogers, Esquire

(*Via CM/ECF Electronic Mail*)